Frederick S. Pendleton v. Commissioner. Frederick W. Mayes v. Commissioner.
Frederick S. Pendleton v. Commissioner
Docket Nos. 7259, 7260.
United States Tax Court
1946 Tax Ct. Memo LEXIS 161; 5 T.C.M. (CCH) 571; T.C.M. (RIA) 46143; June 18, 1946
William W. Owens, Esq., 100 Broadway, New York 5, N. Y., for the petitioner. Bernard J. Long, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion These cases were consolidated for hearing and both involve income tax for the year 1940. The questions here involved are the determination of petitioners' basis for determining gain or loss as to certain stock sold by each of them in 1940 and whether the petitioner, Frederick W. Mayes, is subject to a delinquency penalty for failure to sign and verify his income tax return for 1940. Findings of Fact Petitioner, Frederick S. Pendleton, is an individual residing in Brooklyn, New York. Petitioner, Frederick W. Mayes, is an individual residing in Bradenton, *162 Florida, and having an office in Brooklyn, New York. Petitioners' income tax returns for 1940 were filed with the collector of internal revenue for the first district of New York. In 1940 petitioners were stockholders and officers of Pendleton & Pendleton, Inc., which was organized on or about January 1, 1926 to continue an insurance agency business formerly carried on in partnership form under the name of Pendleton & Pendleton. The partnership of Pendleton & Pendleton was an outgrowth of an insurance agency partnership started in 1876 under the firm name of A. P. Avery. Petitioner, Frederick Pendleton, became associated with the agency in 1885 and the agency was eventually reformed with A. P. Avery, Frederick Pendleton and C. H. Pendleton, an older brother of the petitioner, as partners, the agency's name being changed to Avery & Pendleton in 1890. On December 31, 1902, Avery retired from the partnership and was paid $5,000 for his share in the partnership pursuant to the partnership agreement. Prior to Avery's retirement, Avery, Frederick Pendleton, C. H. Pendleton and W. A. Pendleton, the latter three being brothers, had equal interests in the partnership. On January 1, 1903, the *163 agency's name was changed to Pendleton & Pendleton, and each of the three brothers held an equal one-third share in the partnership. C. H. Pendleton died on October 31, 1911 and thereafter Frederick and W. A. Pendleton each owned a one-half interest in the partnership. Five thousand dollars were paid to C. H. Pendleton's heirs for his partnership interest, this payment being made as provided in the partnership agreement. The business of the agency consisted of writing contracts of insurance as general agents in the Brooklyn area for a number of fire and casualty companies. The business originated with insurance brokers who, in turn, were in contact with the ultimate consumer. As compensation for its services the agency received a commission from the insurance companies on all business written. As agents, the agency had full power to act on behalf of the companies, including entering into contracts of insurance, making inspections, and adjusting losses. In 1913 the agency represented eight fire and four casualty insurance companies and dealt with approximately 500 to 600 brokers from whom it received business. The business of the agency was carried on in two separate offices. The *164 Eastern District office was located at 76 Broadway, Brooklyn, New York, and later in 1913 at 130 Broadway. The Western District office was located at 153 Montague Street in Brooklyn. The two offices were necessitated by the fact that the insurance companies divided Brooklyn into sections, Broadway being the dividing line between the Eastern and Western Districts. Each office was required to operate within its designated district. Separate sets of accounting records were kept at the two offices. Mayes first became associated with the agency on June 12, 1912, as manager of the Eastern District office. No written agreement or contract was entered into at that time between Mayes and the two Pendleton brothers, but his status may be described as an employee or associate with the power of acting as a general agent of the firm in its dealings with the public. As to the "interest" in the firm acquired by Mayes in 1912, the record discloses only the following facts: (1) He was considered by himself and the Pendletons as some kind of "limited partner", (2) In return for his services he was entitled to one-third of the profits of the Eastern Division office and was to "share" in its losses, *165 and (3) the Pendletons advertised to the public that he was a general partner of the firm and gave him the right to sign firm checks. There is no evidence as to the term for which he was to be a "partner", no evidence as to the rights to any of the firm's capital which he acquired at that time, no evidence that he had any voice in the management of the firm or formulation of its policies, and no evidence that he was a party to, or acquired any interest in the agency contracts which the firm held from the insurance companies which it represented. We conclude that in consideration for his services he became entitled for an indefinite length of time, i.e., during his employment, to a compensation equivalent to a percentage of the profits of one of the firm's offices. Upon dissolution of the firm he would be entitled to nothing in liquidation. As compensation for his services Mayes was entitled to receive one-third of the profits of the Eastern District office and was to share in the losses of that office. Mayes did not at that time make any payment of any kind to the partnership or either of the partners. He was invited to join the firm primarily to take up the work of the deceased brother. *166 Mayes at that time had had extensive experience in the insurance field. Until January 1, 1914, he had no financial interest in the Western District office and did not share in the profits or losses of that office. After Mayes became associated with the agency, and until January 1, 1914, he, Frederick Pendleton and W. A. Pendleton each had a one-third interest in the income of the Eastern District office and the latter two each had a one-half interest in the Western District office. During the period, the Pendletons each had a one-half interest in the capital and agency contracts of the firm, including both the Eastern and Western District offices. In the latter part of 1913, W. A. Pendleton advised his brother, Frederick, that he desired to retire from the business. He was in comfortable circumstances and wanted to be relieved of the responsibility of the business. After some thought, Frederick offered him $30,000 for his interest in the partnership. W. A. Pendleton agreed, after thinking it over, to take $30,000 plus an agreement by Frederick to pay him $2,000 per year for life. It was also expressly agreed that W. A. Pendleton was to have the use of the office as he had theretofore *167 used it, including office stationery, the clerical force, telephone service and particularly the services of the cashier to look after his personal affairs when he was absent from the office. He did not offer to sell his partnership interest to anyone except his brother. After the sale, W. A. Pendleton retired from the partnership on December 31, 1913, being 57 years of age at the time. He did not perform any services for the agency after his retirement. On or about January 1, 1914, Frederick Pendleton offered Mayes the opportunity of participating in the agency in its entirety as a general partner. He offered to sell Mayes one-half of the interest in the firm which he had purchased from his brother. Mayes accepted the offer and paid Frederick Pendleton $15,000 cash in installments, and agreed to pay one-fourth of the life annuity to W. A. Pendleton, namely $500 per year. The arrangement by which Mayes was entitled to one-third of the profits of the Eastern District office was simultaneously terminated. Frederick Pendleton thus acquired a three-fourths interest and Mayes a one-fourth interest in all of the business of both offices. Prior to January 1, 1914, Mayes had no right or *168 interest in the partnership which had any fair market value. From January 1, 1914 to on or about December 31, 1925, Frederick Pendleton and Mayes continued the business as a partnership under the name of Pendleton & Pendleton, and their interests in the business remained three-fourths and one-fourth respectively. On about January 1, 1926 the two partners transferred their respective interests in the business and the assets used in the operation of the business to a newly organized corporation known as Pendleton & Pendleton, Inc., which had an authorized capital stock of 3,000 shares. The corporation assumed all of the obligations of the partnership, but the partnership withheld all accumulated undivided profits. In consideration for such transfers Frederick Pendleton became entitled to receive 2,250 shares of the capital stock of the corporation and Mayes became entitled to receive 750 shares. On December 9, 1925, 750 shares of the stock was issued to Mayes. On January 3, 1926, 5 of his shares were transferred to F. S. Shine, under an agreement that they would be returned at Shine's death. These shares were returned to Mayes in April 1935. On December 9, 1925, 2,230 shares were *169 issued to Frederick Pendleton and, pursuant to his instructions, 20 shares were simultaneously issued to W. A. Pendleton, so that the latter could qualify as an officer of the corporation. Shortly after receiving his 2,230 shares, Frederick Pendleton gave 67 shares as gifts to various heads of departments of the corporation. The 20 shares issued to W. A. Pendleton were transferred by him to Frederick Pendleton on February 27, 1941. For the ten years ended December 31, 1912 the commissions earned by the Pendleton Agency were as follows: Commissions
Western District
Eastern District
Total
1903
$ 16,025.85
$ 32,772.92
$ 48,798.77
1904
18,678.40
35,513.74
54,192.14
1905
17,972.98
34,851.66
52,824.64
1906
21,518.18
37,119.52
58,637.70
1907
25,656.99
44,510.18
70,167.17
1908
24,156.47
41,168.77
65,325.24
1909
24,369.97
44,637.18
69,007.15
1910
24,274.98
45,625.07
69,900.05
1911
24,350.18
45,615.93
69,966.11
1912
31,181.50
36,418.73
67,600.23
For the same period, the net earnings of the agency were: Western District
Eastern District
Total
1903
$ 10,016.99
$ 20,524.10
$ 30,541.09
1904
11,463.68
21,579.68
33,043.36
1905
10,358.78
20,817.83
31,176.61
1906
13,126.30
22,891.47
36,017.77
1907
15,023.67
28,288.55
43,312.22
1908
11,481.55
24,764.17
36,245.72
1909
11,355.12
27,811.11
39,166.23
1910
11,312.41
30,148.72
41,461.13
1911
10,676.95
30,060.38
40,737.33
1912
11,630.50
19,759.57
31,390.07
$116,445.95
$246,645.58
$363,091.53
*170 Reserve for comm: Balance, Dec. 31, 1912
$9,000.00
$7,000.00
Balance, Dec. 31, 1902
2,800.00
3,000.00
Net addition to earnings
$6,200.00
$4,000.00
$ 10,200.00
Total for period
$373,291.53
Average for 10 years
$ 37,329.15
The average annual net earnings of the agency for the five-year period 1908 to 1912, both inclusive, was $39,000.10. In 1913 commissions attributable to the Western District were $33,082.33 and to the Eastern District $37,480.66, totaling $70,562.99. In the same year the net income of the Western District was $13,083,53 and that of the Eastern District $20,436.63, totaling $33,520.16. The net earnings of the Eastern District for 1912, 1913 and 1914 were distributed as follows: Est. of C.H.
W.A.
Frederick
F.W.
Pendleton*
Pendleton
Pendleton
Mayes
1912
$3,293.26
$6,558.15
$ 6,558.15
$3,350.00 ** 1/1 - 10/31/1913
2,943.20
4,905.30
4,905.31
4,905.30
11/1 - 12/31/1913
925.84
925.84
925.84
1914
16,216.27
5,405.43
*171 The net earnings of the Western District for the same period were distributed as follows: Est. of C.H.
W.A.
Frederick
F.W.
Pendleton*
Pendleton
Pendleton
Mayes
1912
$1,938.42
$4,846.04
$4,846.04 1/1 - 10/31/1913
2,013.92
5,034.80
5,034.81
11/1 - 12/31/1913 **
1914
9,625.34
$3,208.45
An organization known as the Brooklyn Insurance, Engineering & Inspection Bureau was operated in connection with the Eastern District office. This Bureau started operations in 1913 but after March 1, 1913 and apparently was under Mayes' supervision. The earnings of the Bureau were collected in a separate account of the Eastern District ledger and its profits were distributed separately from the general profits of that District. One-fourth of the profits after January 1, 1914 were distributed *172 to Mayes and three-fourths to Frederick Pendleton. There is no clear evidence in the record as to any distributions of profits of the Bureau in 1913, or to whom they were made. No part of the earnings and distributions of the Bureau are included in the data set forth above as to the earnings and distributions of the Eastern District. Mayes and Frederick Pendleton never received any salary payments from the partnership. The commissions earned and net income of the agency for the period 1903 to 1913, inclusive, have been set forth above. During the remaining life of the partnership, the total commissions earned and net income of the agency were: Commissions
Net Income *
1914
$ 72,974.73
$49,657.47
1915
72,787.93
50,182.56
1916
74,129.57
46,815.68
1917
75,747.73
48,861.88
1918
87,522.77
54,395.34
1919
97,176.31
60,134.58
1920
124,047.31
81,081.39
1921
103,069.27
59,043.09
1922
103,065.83
60,314.77
1923
117,581.80
62,755.29
1924
110,671.96
50,958.51
1925
131,093.97
69,511.95
*173 All of the annual net income of the partnership for 1914 to 1925, inclusive, was distributed to the petitioners in proportion to their respective interests in the partnership. After the corporation was formed, the commissions and annual net income of the corporation and the salaries paid to the petitioners were as follows: Annual Salaries
Net Income
Frederick
Commissions
After Salaries
Pendleton
F. W. Mayes
1926
$146,186.46
$37,492.72
$15,000
$7,500
1927
133,535.19
15,628.10
15,000
7,500
1928
133,124.62
36,284.44
15,000
7,500
1929
124,573.41
28,999.78
15,000
7,500
1930
115,736.76
27,694.32
15,000
7,500
1931
119,034.47
33,463.80
14,250
7,125
1932
107,826.51
28,487.15
12,000
6,000
1933
101,085.25
23,865.18
11,000
5,750
1934
135,538.59
29,378.04
12,000
6,000
1935
156,786.95
45,687.93
12,000
6,000
1936
145,543.93
37,851.96
15,000
7,500
1937
154,749.14
43,002.92
15,000
7,500
1938
129,276.23
20,350.05
15,000
7,500
1939
155,049.97
48,830.85
15,000
7,500
1940
115,988.19
8,026.16
12,250
5,025
1941
118,303.07
21,503.73
12,000
3,600
1942
130,513.25
30,747.93
12,000
1943
128,230.53
19,777.61
12,000
*174 Petitioners also received large dividend distributions annually from the corporation, most of the annual net income being distributed to the stockholders in the form of dividends. From the time of its formation until the end of 1940, the corporation never made any distributions to shareholders except out of accumulated earnings. The $2,000 annual payments due W. A. Pendleton were apparently made annually by the respective petitioners in their pro rata amounts until the end of 1927. However, in the corporation's income tax returns for 1928 through 1933, both inclusive, W. A. Pendleton was designated as an officer of the corporation and the annual payments due him were made by the corporation and deducted as salary expense. The amounts paid him in each of these later years varied, by reason of the fact that in some years he "overdrew" the sum due him and in other years he did not receive the full amounts. Although he was designated as an officer of the corporation, he was such in name only and performed no services for the corporation or the predecessor partnership. The payments to W. A. Pendleton were terminated at the end of 1935 at his own request. He died in 1941. From January 1, 1914 to *175 December 31, 1927, W. A. Pendleton received $21,000 from petitioner Frederick Pendleton and $7,000 from petitioner Mayes. Petitioner Frederick Pendleton has been president of Pendleton & Pendleton, Inc. from its incorporation until the date of the hearing of this cause. Petitioner Mayes was vice president of the corporation from its inception to some time in 1941. Mayes retired from active participation in the business in 1940 or 1941. On or about February 2, 1940 petitioner Frederick Pendleton sold 1,083 shares of his stock in Pendleton & Pendleton, Inc. to the Niagara Fire Insurance Co. and the Fire Insurance Subsidiary Corporation, the purchasers being members of the so-called America Fore Group of fire and casualty insurance companies. The sale was negotiated by Frederick Pendleton with Bernard Culver, the head of the America Fore Group. Pendleton received $128,822.21 for these shares, the purchase price representing $100 per share for the 1,083 shares plus 1,083/3,000 of the then undistributed earnings of Pendleton & Pendleton, Inc. The 1,083 shares so sold by Pendleton were part of the stock originally issued to him on or about January 1, 1926. On or about February 2, 1940, petitioner *176 Mayes sold 500 shares of his stock to the Fidelity & Casualty Co., which also was a member of the America Fore Group. The sale was negotiated by Frederick Pendleton, acting on behalf of Mayes, with Bernard Culver, the head of the America Fore Group. Mayes received $59,404.71 for these shares, the purchase price representing $100 a share for the 500 shares plus 500/3000 of the then accumulated but undistributed earnings of Pendleton & Pendleton, Inc. The shares so sold were part of the original issue to him when the corporation was formed. He had never before transferred or otherwise disposed of any of these shares except possibly 5 shares which he had given to Shine. At the time these shares were sold, Frederick Pendleton and Mayes were respectively 73 and 68 years old. Frederick Pendleton sold his shares because he was about to undergo a serious operation and wanted the control of the corporation to be in strong hands. Mayes had also indicated to Pendleton that he intended to retire from the business. Prior to the sale the purchasers were advised that Pendleton was about to undergo the operation. It is not clear whether the purchasers knew of Mayes' contemplated retirement. The *177 petitioners did not attempt to sell their shares to any one else than the companies in the America Fore Group. The business of the partnership from 1914 to 1926 and that of the corporation from 1926 was not personal to Frederick Pendleton and Mayes, inasmuch as the business has been in the control of various different individuals and groups since the inception of the agency in 1876 and has continuously prospered. There was no material change in the total commissions received by the agency after the America Fore Group companies acquired control of it. The continued participation of Frederick Pendleton in the management of the agency was valuable to the new controlling interests in view of his influence and standing in the insurance business in Brooklyn, but the value of the agency was not materially dependent upon Pendleton's and Mayes' continued participation in its affairs. In the period around March 1, 1913, the agency dealt with between 500 to 600 insurance brokers and represented twelve fire and casualty insurance companies. The agency was not dependent upon any large brokerage accounts for the bulk of its business nor was it dependent for the successful conduct of its business *178 on its continued representation of the insurance companies which it then represented. Subsequent to March 1, 1913, the agency did sever its connections with some companies it represented and took on the representation of new companies. In the year prior to 1940, the agency dealt with 1,000 to 1,200 brokers. It appears that the agency agreements of the partnership and later the corporation with the insurance companies it represented were terminable at will and that the brokers with which the agency did business were under no contractual obligations to take their business to this agency. The assets and liabilities of the partnership of Pendleton & Pendleton as of December 31, 1912 were as follows: Western
Eastern
district
district
ASSETS
office
office
Combined
Cash
$ 8,309.67
$ 6,745.71
$ 15,055.38
Uncollected premiums
50,472.05
42,783.23
93,255.28
Bills receivable
1,536.60
1,536.60
Return premiums
36.36
36.36
$58,818.08
$51,065.54
$109,883.62
LIABILITIES
Balance due insurance companies
$41,669.26
$41,643.30
$ 83,312.56
Sundry creditors
178.97
658.41
837.38
Return premiums unpaid
250.62
250.62
Prepaid premiums
146.30
138.40
284.70
Reserve for brokerage comm
9,000.00
7,000.00
16,000.00
Undistributed net income from real
estate operations *
519.69
258.50
778.19
Partners' accounts
7,303.86
1,116.31
8,420.17
$58,818.08
$51,065.54
$109,883.62
*179 As of December 31, 1939, the balance sheet of Pendleton & Pendleton, Inc, reflects the following: ASSETS
Cash in banks
$ 42,308.85
Cash in office
1,187.71
Uncollected premiums
144,580.83
Return premiums
94.26
Due from companies: Providence Washington Insurance Co. - Tourist
14.17
Stocks and investments - at cost
48,852.10
Furniture and fixtures
10,000.00
Good will
290,000.00
Shortage
4.71
$537,042.63
LIABILITIES
Balance due companies: Representative companies
$136,533.46
General companies
613.89
Prepaid premiums
1,282.97
Return premiums unpaid
2,641.70
Exchange
136.10
135 Montague Street, Brooklyn, N.Y.
346.22
130 Broadway, Brooklyn, N.Y.
88.35
Dividends payable
24,000.00
Reserve for brokerage commission
23,382.70
Capital stock
300,000.00
Reserve for stockholders' undivided profits
48,017.24
$537,042.63
*180 In their Federal income tax returns for the calendar year 1940, Frederick Pendleton and Mayes claimed a basis of $100 in the shares sold by them in that year, and they respectively reported long-term capital gains of $20,522.21 and $9,404.71 arising out of their sales of these shares. Respondent has determined that the basis of each petitioner in the shares sold by him in 1940 was $20.00 per share. Petitioner Mayes filed his individual income tax return for the year 1940 within the time required by law. He failed, however, to sign the return on page 4 at the place provided for signature and he failed to swear to it. Mayes suffers from bronchial asthma and was ill when the time came for filing the 1940 return. He made out the appropriate Form 1040 entirely in his own handwriting and then requested a friend who was a "tax man" to take care of the matter. Mayes admits that there was no reason why he should not have signed the return except that he assumed that his friend "would take care of the thing to the fullest extent." He did not learn of his failure to sign or swear until some time in 1943. Respondent has determined a 25 percent delinquency penalty in the amount of $1,882.78 *181 in connection with this return on the ground that since the return was neither signed nor sworn to, it was not the required return under the statute. The fair market value as of March 1, 1913 of the business of the insurance agency operated by the partnership of Pendleton & Pendleton was $120,000. The basis of petitioner Pendleton as to the stock of Pendleton & Pendleton, Inc., sold by him in 1940 was $42.67 per share. The basis of petitioner Mayes as to this stock was $29.33 per share. The failure of petitioner Mayes to make and file an income tax return required by law for the year 1940 was not due to reasonable cause. Opinion KERN, Judge: Petitioner Frederick Pendleton contends that his basis as to the 1,083 shares of stock in Pendleton & Pendleton, Inc. which he sold on February 2, 1940 was at least $69.64 per share and petitioner Frederick Mayes contends that his basis as to the 500 shares which he sold on the same date was at least $124.11 per share. Respondent contends that the basis to each of the petitioners of the stock sold by them in 1940 was $20.00 per share. The question here at issue, therefore, is the determination of the proper basis to each of the petitioners *182 of the stock sold by him in 1940. The transaction of January 1, 1926 when the petitioners exchanged their respective interests in the partnership of Pendleton & Pendleton for stock of Pendleton & Pendleton, Inc., clearly was an exchange falling within the scope of section 112 (b) (5) of the Internal Revenue Code. [1] Under section 113 (a) (6) of the Code, their bases in the stock were the same as their bases in the property transferred. [2] Petitioners do not assert that their original bases exceeded the March 1, 1913 value of such interests as they may respectively have had in the partnership at that date. [3] We must, therefore, determine the bases of the respective petitioners in the partnership interests transferred by them on January 1, 1926. *183 Petitioners have offered expert testimony to the effect that the fair market value of the business of the insurance agency on March 1, 1913 was approximately $275,000. We are of the opinion, however, after a consideration of all of the evidence in the light of every standard of value that the fair market value of this business as of that date was $120,000. Any interest or right which petitioner Mayes had in the business of the partnership on March 1, 1913 had no market value. The facts on which we rely for this conclusion are set out in our findings. As of March 1, 1913, petitioner Frederick Pendleton had a one-half interest in the partnership of Pendleton & Pendleton. The basis of petitioner Frederick Pendleton in the three-fourths interest in the partnership which he held after January 1, 1914 was $96,000 computed as follows: March 1, 1913 value of partnership interest
$60,000.00
Plus: Cash paid for interest of W. A. Pendleton, Dec.
31, 1913
30,000.00
$90,000.00
Less: Cash received from F. W. Mayes for 1/4 interest in
Western District
15,000.00
15,000.00
75,000.00
Plus: Contributions to annuity of W. A. Pendleton
21,000.00
$96,000.00
*184 The basis of petitioner Mayes in the one-fourth partnership interest which he held after January 1, 1914 was $22,000, computed as follows: Cash paid to F. Pendleton on January 1, 1914 for 1/4 interest in partnership
$15,000.00
Plus: Contributions to annuity of W. A. Pendleton
7,000.00
$22,000.00
The bases of the respective petitioners in their partnership interests on December 31, 1925, carried over to the shares of stock in Pendleton & Pendleton, Inc. which they received for their interests. Inasmuch as the 20 shares in Pendleton & Pendleton, Inc. issued to W. A. Pendleton on December 9, 1925 apparently were a gift from Frederick Pendleton, the full 2,250 shares to which the latter was entitled must be considered in computing the basis of each share of stock acquired by Frederick Pendleton. The per share basis of petitioner Frederick Pendleton was, therefore, $96,000 divided by 2,250 or $42.67. The per share basis of petitioner Mayes was, therefore, $22,000 divided by 750 or $29.33. The payments of $2,000 per annum made by the corporation from January 1, 1928 through 1935 cannot be considered in determining the basis of the respective petitioners in their *185 stock. These payments were treated by the corporation as salary payments and were deducted as such in the corporation's income tax returns. Respondent's determination of a 25 per cent delinquency penalty in connection with the 1940 individual income tax "return" of petitioner Mayes must be sustained. The purported "return" filed by Mayes was not the return required by the statute, since it was neither signed nor verified. [4]Plunkett v. Commissioner, 118 Fed. (2d) 644, affirming 41 B.T.A. 700; Robert A. Burns, 47 B.T.A. 34. Cf. Lucas v. Pilliod Lumber Co., 281 U.S. 245; Burford Oil Co. v. Commissioner, 153 Fed. (2d) 745, affirming 4 T.C. 615; Uhl Estate Co. v. Commissioner, 116 Fed. (2d) 403; and Estate of Frederick L. Flinchbaugh, 1 T.C. 653. *186 Petitioner Mayes has not established that his omission was due to reasonable cause and not due to willful neglect. See George S. Groves, 38 B.T.A. 727, 738. Decision will be entered under Rule 50. Footnotes
*. The payments to the Estate of C. H. Pendleton represent distributions of the profit on business written prior to C. H. Pendleton's death, but not received by the firm until after his death. ↩
**. From June 10, 1912.↩
*. The payments to the estate of C. H. Pendleton represent distributions of the profit on business written prior to C. H. Pendleton's death, but not received by the firm until after his death. ↩
**. For the months of November and December 1913 commissions exceeded expense by $183.26, which amount was added to reserve for commission on uncollected premium.↩
*. Includes net income attributable to Brooklyn Insurance, Engineering & Inspection Bureau. No salaries were paid during this period to the partners.↩
*. These real estate operations accounts were carried in the books of the respective districts although they had no relation to the partnership's insurance business. It appears that interests in the various properties were not necessarily in relation to the partner's respective interests in the partnership.↩
1. Internal Revenue Code. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * *
(b) Exchanges Solely in Kind. - * * *
(5) Transfer to corporation controlled by transferor. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * * ↩
2. Internal Revenue Code. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (unadjusted) of Property. - * * *
(6) Tax-free exchanges generally. - If the property was acquired, after February 28, 1913, upon an exchange described in section 112 (b) to (e)↩, inclusive, * * *, the basis * * * shall be the same as in the case of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized upon such exchange under the law applicable to the year in which the exchange was made. * * * 3. (14) Property acquired before March 1, 1913. - In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted (for the period prior to March 1, 1913) as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. * * *↩
4. Internal Revenue Code. SEC. 51. INDIVIDUAL RETURNS. (a) Requirement. - The following individuals shall each make under oath a return stating specifically the items of his gross income and the deductions and credits allowed under this chapter and such other information for the purpose of carrying out the provisions of this chapter as the Commissioner with the approval of the Secretary may by regulations prescribe - (1) Every individual who is single or who is married but not living with husband or wife, if having a gross income for the taxable year of $800 or over. (2) Every individual who is married and living with husband or wife, if no joint return is made under subsection (b) and if - (A) Such individual has for the taxable year a gross income of $2,000 or over, and the other spouse has no gross income; or (B) Such individual and his spouse each has for the taxable year a gross income and the aggregate gross income is $2,000 or over. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. * * *↩